HARRY TROLL, Public Administrator, in charge of Estate of HECTOR A. PIEDNOIR, JR., deceased, Respondent, v. DAUGHERTY & BUSH REAL ESTATE COMPANY, Appellant.

St. Louis Court of Appeals.    Argued and Submitted November 4, 1914.    Opinion Filed December 8, 1914.

1. PRINCIPAL AND SURETY: Pledges: Duty of Pledgee: Discharge of Surety. It is the duty of a person holding collateral security to carefully and faithfully perform all acts necessary to make the collateral available, and if he fail to perform this duty, as a result of which the collateral is lost, a surety for the debt is discharged, to the extent that he is thereby injured.

2. ————: ————: Discharge of Surety. Where a surety for a debt consents, either expressly or impliedly, to release a part of the collateral security, he is not discharged by reason of such release being made.

3. APPELLATE PRACTICE: Conclusiveness of Finding: Equity Suits. The appellate court is not bound by the finding of the trial court in an equity suit, but may draw its own conclusion from the facts in evidence as presented by the record; but where the evidence is conflicting, and there is substantial evidence to support the finding, the appellate court will defer very greatly thereto.

4. PLEDGES: Foreclosure: Defenses: Sufficiency of Evidence. In an action to recover the balance due on promissory notes which were secured by the pledge of collateral, and to foreclose the equity of redemption in such collateral, defended on the theory that plaintiff had released other collateral which also had been pledged, for much less than its value, without defendants' consent, evidence held to justify a finding that defendants gave their consent to the release of the collateral.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm*, Judge.

AFFIRMED.

*S. T. G. Smith* for appellant.

(1) A person holding commercial paper as collateral security for a debt due him has no right to compro-

mise with the parties who owe the paper held as security for a less sum than the sum due on the paper held as security, and if he does he will be compelled to account to the pledgor for the full value of the security so released. Wood v. Matthews, 73 Mo. 477; National Exchange Bank v. Kilpatric, 204 Mo. 119; Union Trust Co. v. Rigdon, 93 Ill. 458; Griggs v. Day, 32 Am. St. 704 (136 N. Y. 152); Fisher v. George S. Jones Co., 108 Ga. 490; Brown v. First National Bank, 112 Fed. 901; Harrell v. Citizens Banking Co., 111 Ga. 846. (2) The pledgee of commercial paper as collateral security for the payment of a debt has no authority to sell the commercial paper held by him, either at public or private sale, but is bound to hold and collect the same as it becomes due and apply the net proceeds to the payment of the debt so secured. Richardson v. Ashby, 132 Mo. 238.

*J. L. Hornsby* for respondent.

(1) A pledgee may, with the consent of the pledgor, compromise or release the security held by him. (2) The appellate court will give much deference to the findings of the trial court on account of the superior advantages the latter possesses for weighing the evidence and judging of the credibility of witnesses. Parker v. Roberts, 116 Mo. 667; Snell v. Harrison, 83 Mo. 651; Loan & Trust Co. v. Browne, 177 Mo. 412; Crawford v. Dixon, 97 Mo. App. 558.

REYNOLDS, P. J.—This is a suit in equity by respondent, as public administrator in charge of the estate of one Hector A. Piednoir, deceased. The petition sets up that Piednoir in his lifetime held notes secured by a deed of trust on various properties, one note being for $10,000 and fifty notes for $200 each, aggregating $10,000, all executed by appellant, all the notes representing but one indebtedness of $10,000.

During the lifetime of Piednoir the indebtedness had been reduced until, as it is claimed, it amounted to $1400 with accrued interest, and all the collaterals had been released except a deed of trust on a certain lot on Wyoming street and fifty-seven notes executed by one Lila Drumm, and also a certain leasehold to a building on Chestnut street in the city of St. Louis. Averring that this $1400 and accrued interest still remains due and unpaid, plaintiff prays judgment for the debt and interest, for reasonable attorney's fee, and that the equity of redemption of defendant in these fifty-seven notes, together with the deed of trust securing the same and covering the lot on Wyoming street, as well as the leasehold on Chestnut street, might be foreclosed and that the collaterals, or so much thereof as may be necessary, be sold to pay off and discharge the debt.

The answer challenges the claim of any remaining indebtedness, averring that one of the pieces of property pledged, consisting of parts of two lots in Temple Place, had been discharged from the lien of the deed of trust without the knowledge and consent of defendant and for the sum of $2500 (at the trial it appeared that this should have been $2000), when in point of fact the equity of the defendants in it was worth $5000, and judgment over is asked by the defendant for this difference.

The trial was before the court, as in equity, and resulted in a finding for plaintiff as prayed by it, save as to attorney's fees, the claim to which was not pressed, and a denial of the relief asked by defendant. From this defendant has appealed.

There are but two points that need be considered in the determination of this case. First, whether the evidence warranted the learned trial court in finding that the Temple Place property had been released with the consent of defendant, and, second, if that consent

had not been given, whether defendant had sustained any loss by the release of that property.

Turning to the evidence in the case, it appears that there had been a practical dissolution of the corporation defendant and a distribution of its assets among the two gentlemen, Messrs. Dougherty and Bush, who appear to have been practically the sole owners of its stock and to have composed the corporation, as well as of another allied one, called the Hampton-Russell Investment Company. It appears that on this dissolution, Mr. Dougherty took over certain of the assets, including the properties which are here in controversy, all under various mortgages, the defendant company holding merely equities in them subject to two or more prior encumbrances. Being indebted to a Mr. Dowling and being pressed by Dowling for a payment of his indebtedness, Dougherty told Dowling that he had not the money to pay him, and telling him that he and Mr. Bush had divided up their interest and that he (Dougherty) had taken over the equities in a lot of property, he would turn that equity over to Dowling. Dowling figured on the value of the property, and finding it all under two or more deeds of trust, and that the only interest of the defendant corporation was in the equities, and figuring up the encumbrances, agreed that if Dougherty would straighten up some of the indebtedness, taxes, etc., he would take it. Dougherty told him he could not do anything of the kind; that he (Dowling) would have to take it just as it was. Dougherty explained to Dowling that the properties were tied up in the blanket deed of trust which was held by Piednoir, and if he took the properties subject to this encumbrance, he (Dowling) would have to work his way out of it the best he could, and if he sold any of the property which Dougherty was transferring to him, he (Dowling) could get a release of the property so sold from the Piednoir

deed of trust; that "by making a right payment to Mr. Piednoir he would release;" that he (Dowling) would have to satisfy Mr. Piednoir before he would give a release to any of the property. Dowling finally agreed to take the properties but objected to taking them in his own name as he did not wish to personally assume the encumbrances. Accordingly the Temple Place with other properties, but not the leasehold nor the Wyoming street lot, were deeded over to his wife by the Hampton-Russell Investment Company, the subsidiary company of the defendant corporation, above referred to, by a deed of warranty, subject, however, to taxes and "all encumbrances of record," title to the equities in the properties being in the Hampton-Russell Investment Company by mesne conveyances from the defendant company.

The indebtedness of defendant to Piednoir originally was $10,000, evidenced by a $10,000 note as well as by fifty notes for $200 each, the latter payable monthly. Mr. Hornsby was the agent and attorney for Piednoir in the collection of this indebtedness during the latter's lifetime and from time to time Dowling paid off several of these collateral notes to Hornsby as such agent, and as he paid off any of the notes he secured releases from Piednoir on various pieces of property that he, more accurately his wife, had thus acquired and which Piednoir held. That is, he and Hornsby or Piednoir agreed upon the price which should be paid for the release of these separate pieces of property. It does not appear that either Dougherty or Bush were consulted or had anything to do with these releases, or the terms upon which they were made. As Dougherty would sell any of these pieces in which he held equities of the Hampton-Russell Investment Company, he would procure a release from Piednoir for that piece, paying him what was agreed upon apparently between Piednoir, or Hornsby, as his representative, and Dowling. It is in evidence that

Troll v. Real Estate Co.

ooth Dougherty and Bush knew of Dowling obtaining these releases from time to time and had never made any objection to them; on the contrary, when informed from time to time of what had been done with reference to them, Dougherty and Bush appeared satisfied and told Dowling that he was "doing fine in getting rid of the stuff and reducing the indebtedness." It does not appear from any evidence that Dougherty or Bush suggested that they were to be consulted in the matter of releases, or that they were to have anything to do with that, or that they ever set any amount that was to be paid on any particular piece of property for its release or set any terms which Dowling would be authorized to make with Piednoir or with his representative in obtaining the release of any particular piece; the whole matter of releases was apparently left to Dowling and Piednoir; what Dougherty said when negotiating the matter with Dowling was that he (Dowling) would be able to get along all right with Piednoir and Hornsby as his agent, and that Hornsby would treat Dowling all right in the matter of releases.

Having acquired the equities in these properties, it appears that Dowling negotiated for a trade of this Temple Place property for some other property in the city of St. Louis, and to do so it was necessary to have it released from the Piednoir deed of trust. It appears that both Dougherty and Bush knew of this but neither of them said anything to Hornsby about it or made any suggestion to Dowling. When Dowling was ready to close this trade and had arranged with Mr. Hornsby for the release of the Temple Place property from the lien of this deed of trust, he went to Mr. Dougherty and obtained from him certain of the collateral notes which had been paid and which were covered by this deed of trust, the notes being in the possession of Dougherty, and which it was necessary to present to the recorder of deeds in order to have the release en-

tered of record. He then told Dougherty that he had obtained the release from Hornsby and needed these notes to get the deed of trust released. Dougherty gave him all of the notes which he held except one, which appears to have been lost, and said at the time he gave them to Dowling that he was "glad he got along with it that way." With these notes as well as those which were in possession of Hornsby in hand, Dowling had this Temple Place property released from the deed of trust. Hornsby, as agent for Piednoir, received $2000 from Dowling and gave a release of the Temple Place property, crediting the $2000 on the indebtedness, thus cutting the principal down to about $1400. It appears from the testimony of Hornsby that after he had made the negotiation with Dowling for the release of this property and had received the $2000 for that release and had turned over the release to Dowling, that Mr. Bush, one of the officers and joint owner with Dougherty in the defendant corporation, came to him and asked him if Dowling was about to procure the release of this property. Hornsby told him that he had already released it to him, but testified that he did not remember telling him the amount for which he had released it. Bush says he did not tell him, nor did he ask him what the amount was; all that Bush said at the time, according to Hornsby, was that Dowling had promised him that he would let him know before he closed the deal about the Temple Place property. He expressed no dissatisfaction with the fact of the release. He complained that the negotiation had been carried on and consummated by Dowling without Dowling first having conferred with him about the matter, as he said Dowling had promised to do. Dowling on his part denied that he had any such arrangement with Bush but said that the whole matter of obtaining releases on such terms as he could secure from Piednoir or his representative had been turned over to him by Dougherty and by Bush when

he took over the equities which were in the name of the defendant corporation in this Temple Place and other property along with the other property.

So much for the matter of consent.

Turning to the question of the value of the equity in the Temple Place lots, we find the testimony was that this value did not exceed $7000 or $7500; other testimony was to the effect that it was worth not to exceed $5000. There were two prior deeds of trust on this Temple Place property, each for $4800. There were also $6300 unpaid on the $10,000 (the Piednoir) indebtedness, and Dowling paid off $600 on this before he secured the release of the Temple Place property. That is, there were $7500 due on the whole debt, for which Piednoir held the Temple Place property, the Wyoming street property and the leasehold, as well as fifty-seven of the notes and perhaps other pieces of propetry. When the $2000 were paid for the release of the Temple Place property, Piednoir still had the Wyoming street property, the leasehold and the collateral notes. The highest value put upon the Temple Place property was $7750. Dowling had tried in vain to sell them for $7000 each. So the evidence places the equity as worth from $3250 to $2500.

There can be no question of the principles which must govern cases of this kind. On the kindred question of the discharge of a surety by the acts of the creditor, it is said by an accepted authority (1 Brandt on Suretyship & Guaranty (3 Ed.), sec. 480), that "if the creditor has a surety for the debt, and also has a lien on property of the principal for the security of the same debt, and he relinquishes such lien, or by his act such lien is rendered unavailable for the payment of the debt, the surety is, to the extent of the value of the lien thus lost, discharged from liability. . . . Upon obtaining such a lien the creditor becomes a trustee for all parties concerned, and is bound to apply the property to the purposes of the trust. . . . The surety

is entitled, upon paying the debt, to subrogation to all the securities which the creditor may have at any time acquired for the payment thereof, and it results as a corollary from this proposition, that if this right is rendered unavailing by the act of the creditor, the surety is discharged to the extent that he is injured."

It is further said by this author that the mere silence of the surety when he knows that the creditor is about to release securities, will not prevent his discharge, "as in such case he is not called upon to speak. But where such release is made at the instance and request of the surety, he is not thereby discharged." One of the authorities cited for this, Polak v. Everett, Law Rep. 1 Q. B. Div. 669, states the rule somewhat differently, following what was held in Freeman v. Cooke, 2 Ex. 654, where it was said "that if a man stands by and allows another to act without objecting, when, from the usage of trade or otherwise, there is a duty to speak, his silence would preclude him as much as if he proposed the act himself."

In Pence v. Gale, 20 Minn. 257, it is held that where the owner of a promissory note who holds collateral security for it, gives a release at the surety's instance and with his consent the surety is not discharged. So, too, in Brown v. Abbott, 110 Ill. 162, where it is held that when a party consents to the doing of the act which would not have been done but for his assent thereto, the person so assenting will not be permitted to make the doing of it a matter of personal advantage to himself.

The settled law of our State, in line with that recognized all over the country by all respectable authorities, is, that it is the duty of the party holding a collateral as security to carefully and faithfully perform all acts necessary to make the collateral available and that this is a duty owing to the surety and failing in it by which the collateral is lost, the surety will be discharged to the extent he is thereby injured. [Na-

tional Exchange Bank v. Kilpatric, 204 Mo. 119, 102 S. W. 499.] The rule running through all the authorities being, that if the surety consents to the release of part of the property, he will not be discharged by the release of that part of it, the question here is, whether this defendant, or its representative did consent to the release of this Temple Place property. It is not necessary that the consent should be in express terms; it may be implied here as in all other cases as well by acts and course of conduct as by express words.

Applying these principles to this case, we cannot but conclude with the learned trial judge that in turning over the equities of the defendant to Dowling, and that is all that defendant had in these various pieces of property, and referring him to Piednoir or to his agent as the parties who would do the right thing by him with respect to releases, as well as by the other acts in evidence to which we referred, Dougherty and defendant, through him, left the terms of the release so entirely a matter to be settled between Dowling and Piednoir and his agent and had in so many prior instances connected with releases of the property conveyed to Dowling, ratified or acknowledged this as the proper manner of transacting the business, that it cannot now be claimed that the defendant is entitled to be discharged from any part of this liability by reason of the release of the Temple Place property from under the deed of trust. Considering the course of conduct of the parties in this matter, it would be inequitable and unfair to now hold that the release of this Temple Place property was without authority and unauthorized. That is undoubtedly the view taken by the learned trial court of this matter.

It is hardly necessary to remark that in suits of this kind, that is, in equity, heard before the court as chancellor, the appellate court is not bound by the finding of the chancellor on the facts but may draw its own conclusion from the facts in evidence as presented by

the record. When, however, the evidence is conflict-ing, and there is substantial evidence to support the finding, appellate courts yield very greatly to the con-clusion on that reached by the chancellor. [New Eng-land Loan & Trust Co. v. Browne, 177 Mo. 412, l. c. 423 et seq., 76 S. W. 954.] It must be said that an examination of the evidence in this case does not pre-sent an unchallenged state of facts, one way or the other, either on the question of consent or of value; in short, it is conflicting. As in all cases, the weight to be given it depends very largely upon the appear-ance and manner of the witnesses who gave it. That was a matter peculiarly under the observation of the chancellor, who saw and heard the witnesses. We do not think, on a careful consideration of the evidence and applying to it the principles of law to which we have referred, that we would be justified in setting aside the action of the trial court. As this disposes of the case, it is unnecessary to pass upon the ques-tion of the value of the equity in the Temple Place property, further than to say that there is substantial evidence to show that defendant sustained no loss by it release for $2000. That being so, even if the release of that piece of property was not authorized, defendant, not being damaged, is not in a position to complain. [Jones on Collateral Securities (3 Ed.), sec. 515a; National Exchange Bank v. Kilpatric, supra.]

The judgment of the circuit court is affirmed. *Nor-toni* and *Allen, JJ.,* concur.